CITY OF ASHLAND, Respondent, vs. NORTHERN PACIFIC RAILWAY COMPANY, Appellant.

*September 10—September 29, 1903.*

*Municipal corporations: Vacation of streets: Void ordinance: Occupation by railways: Estoppel.*

By an agreement between railway companies and a city the former were to contribute to the improvement of a certain street and the city was to vacate parts of certain other streets to accommodate the railway yards and depots. The city passed an ordinance in form vacating said parts of streets, and the companies fulfilled the agreement on their part. The ordinance was void because statutory requirements were not complied with, and six or seven months after its passage it was repealed. In the absence of proof that defendant (one of said railway companies) had erected any structures or incurred any considerable expense in reliance upon the attempted vacation, it is *held* that the city is not estopped to claim that the streets had not been vacated. *Ashland v. C. & N. W. R. Co.* 105 Wis. 398, followed.

MARSHALL, J., and CASSODAY, C. J., dissent, being of the opinion that in view of all the circumstances (including the undisturbed occupancy of the streets by the railway companies for more than ten years, positive acts of encouragement on the part of the city to continue such occupancy, the expenditure of large sums by the railway companies in improvements, and the final creation of a situation from which they cannot recede without great loss) the city should be held estopped.

APPEAL from a judgment of the circuit court for Ashland county: JAMES O'NEILL, Judge.  *Affirmed.*

This is a companion suit to that presented in *Ashland v. Chicago & Northwestern R. Co.* 105 Wis. 398, 80 N. W. 1101.  To the statement of facts there made we now refer. A clear understanding of the situation, however, requires a little more amplification of the facts.  The three railroad companies, or their predecessors, the Chicago & Northwestern, Northern Pacific, and Wisconsin Central, some time prior to 1887 owned a large tract of land in Ashland between Third street on the north and Sixth street on the south, and between Vaughn avenue on the west and Prentice avenue on the east, a distance of seven blocks east and west, which had been largely donated to them by the individual owners, and in that space had their depots, as also did the present defendant and the Wisconsin Central have their yards.  The business part of the city stretched along Front street and Second street, and also along the lake shore, where the mills were situated; the most central part of that business portion being at about Third Avenue West.  Meanwhile a considerable residence settlement had grown up to the south of this railway tract, access from which to the business portion would naturally be attained over the various avenues, including Second, Third, and Fourth Avenues West.  The scheme of vacating streets and alleys embraced in the contract of October 1, 1887, and in the ordinance of December 1, 1887, involved the vacating of all the avenues through this tract except Ellis avenue and Third Avenue West, thereby cutting off the use of Second and Fourth Avenues West and of Second and Third Avenues East.  Ellis avenue was to be a thoroughfare.  Third Avenue West was not affected, but has since been wholly obstructed by a stone passenger station.  At the time of the commencement of this action the three railroad companies had quite extensive switching yards within this tract, each of them having five, six, or seven tracks crossing

the avenues and substantially occupying Fourth and Fifth streets, and the defendant having put in place a roundhouse, small repair shops, and some other structures. To what extent this was an increase over what existed prior to 1887 is not proved, but the case was argued on both sides on the assumption that a very considerable amount of the expenditure had been since that time. But there was no proof that any part thereof had been made prior to the ordinance of June 26, 1888, repealing the vacating ordinance of the December previous. The present action affects both Second and Fourth Avenues West. There was no evidence that the defendant had erected any structures in either of these avenues, except as it had laid tracks across the same; nor was there evidence that any of the railroads had any structures in either of these streets, except that the Wisconsin Central freighthouse extended nearly across Second avenue, but that had been erected prior to 1887. The evidence is substantially undisputed to the effect that the opening and use of these two avenues for general travel will seriously incommode the railroad companies in the use of this territory for yard purposes; perhaps to an extent to force them to find other locations for their yards. There is also evidence that the Wisconsin Central has erected upon Third avenue an expensive passenger station, but not in reliance upon the claimed vacation of 1887. Whether by other authority, is not made to appear. There is no evidence as to whether the defendant did or did not have notice of the passage of the repealing ordinance of June, 1888, but it was stipulated that it was duly published, as required by the charter, on June 30, 1888.

The court found as a fact that between October 1, 1887, and September 9, 1888, no step was taken, and no act performed, money expended, or obligation incurred, by the defendant in reliance upon or induced by the passage of the vacating ordinance of December 1, 1887, or other acts of the common council of the city of *Ashland* or of the plaintiff,

growing out of or connected with the proposition of Octo-
ber 1, 1887; but that the defendant paid to the treasurer on
September 9, 1888, $2,307.32, as its part of the cost of ex-
cavating Vaughn avenue and constructing a drain or box cul-
vert therein. Judgment was entered in favor of the plaintiff,
the result of which was to command the defendant to behave
toward Second and Fourth avenues as if they were streets,
instead of as if they were its property. From that judgment
the defendant appeals.

For the appellant there was a brief by *Louis Hanitch,* at-
torney, and *C. W. Bunn* and *Emerson Hadley,* of counsel,
and oral argument by *Mr. Hanitch.*

For the respondent there was a brief by *F. J. Colignon,*
attorney, and *Dillon & Colignon* and *Tomkins & Tomkins,*
of counsel, and a supplemental brief and oral argument by
*F. J. Colignon.*

DODGE, J. This case, having been presented in two argu-
ments, has been carefully examined and re-examined, to as-
certain whether it is distinguishable from *Ashland v. C. &
N. W. R. Co.* 105 Wis. 398, 80 N. W. 1101, so as to take it
out of the rule established in that case. We find nothing of
material distinction. The two actions, as also another against
the Wisconsin Central Railway, were commenced at the same
time, and issue joined by practically identical pleadings. The
alleged contract between the railroads and the city and the
action of the council and the citizens with reference to the
streets relied on by appellant are common to both actions.
The proof as to occupation of the streets and intervening
blocks and expenditure of money thereon is for all legal pur-
poses the same, although carried somewhat more into detail
in this action. The time when any of the acts were done or
expenditures incurred with reference to dates of ordinance
purporting to vacate the streets and the repeal thereof is left
no less vague now than it was in the former case. The proof

of acts by the citizens and by city officers by way of insistence
upon right of passage and of· maintaining sidewalks on
Fourth avenue is, if anything, stronger and more definite in
this record, as also is the proof that defendant had already
established its depot and yards in their present locality be-
fore any of the acts on the part of the city council now urged
as ground for belief in the abandonment of the streets. It is
also made more clearly apparent that the portion of Fourth
avenue on which an engine house and certain other city offices
were built—some before and some after 1887—was not in-
cluded in the vacation contract or ordinance. The only mate-
rial distinction consists in that the trial court in the former
case decided that facts were established to warrant a court of
equity in arousing equitable estoppel, while in this case the
trial court has decided the other way. In the *Northwestern
Case* we were obliged to decide that there was a clear pre-
ponderance of evidence against such a state of facts as would
justify estoppel, while in the instant case we need only to
find absence of clear preponderance in favor of such state of
facts. As a result of such comparison of the two cases we
cannot but consider this ruled by the former, and affirm the
present judgment, if the rule *stare decisis* is to control.

Some attempt—though in justice to appellant's counsel
we must concede not a very urgent one—is made to assert
that we held in the former case that the illegal action of the
city council in contracting to vacate and in enacting vacat-
ing ordinance could not be given weight in deciding whether
the conduct of the city and of the appellant had been such
that the former must be held estopped to insist on the exist-
ence of these streets, and upon such assertion to predicate an
argument against the soundness of the doctrine. We find no
such position taken, as is apparent from the opinion, properly
understood in the light of the discussion in the case. We—
for our lamented brother, BARDEEN, J., spoke for the court,
and with its hearty approval—first declared reaffirmation

of the doctrine of *Goodrich v. Milwaukee,* 24 Wis. 422, 436,
and *Paine L. Co. v. Oshkosh,* 89 Wis. 449, 61 N. W. 1108,
that acts and conduct on the part of a city might be such as
to arouse equitable estoppel. Then we turned to the principal
argument of the railway company's counsel—that, because the
company paid money for grading Vaughn avenue as a consid-
eration for a pretended contract to vacate certain streets, the
city was estopped; which, as evinced by the findings, was
a principal consideration with the trial court. As to that we
said that such an attempted contract is not sufficient, for the
reasons there well stated. To hold otherwise would be to
deny all efficacy to laws restricting powers of city officers;
would place the public at the mercy of those who might, by
unprovable means, induce such officers to deliberately break
such laws. We did not, however, declare that the attempted
vacating of streets by a void ordinance might not be consid-
ered in association with other facts and circumstances, and
the whole be held cogent enough to bring into operation an
estoppel against a city. That we had no such intention is
rendered plain by the very context of the opinion, pointing
out that there was no clear and sufficient proof that the rail-
way company had erected any structures or incurred any con-
siderable expense in reliance upon that attempted vacation,
they being chargeable with knowledge of its repeal. The
necessity of proof of both the inequitable conduct of the city
and great and irreparable wrong to parties honestly and in
good faith relying thereon is well and properly declared.
That is forcibly expressed by the courts of Illinois, on whose
decisions the doctrine of *Paine L. Co. v. Oshkosh, supra,*
largely rested. They have very recently had occasion to in-
sist upon great caution in applying it. *Catlett v. People,* 151
Ill. 16, 24, 37 N. E. 855; *De Kalb v. Luney,* 193 Ill. 185,
190, 61 N. E. 1036; *Shirk v. Chicago,* 195 Ill. 298, 63 N. E.
193. See, also, Elliott, Roads & Streets (1st ed.) 660. We
find nothing in the rules of law laid down in *Ashland v. C. &*

*N. W. R. Co.* with which we cannot now agree, and therefore deem it controlling in the decision of the present case.

*By the Court.*—Judgment affirmed.

MARSHALL, J. (*dissenting*). If the decision of this case had been strictly confined, as it might well have been, to the single question of whether the finding of fact that appellant did not change its position on the faith of the vacating ordinance prior to the repeal thereof is against the clear preponderance of the evidence, I could concur with my brethren. Through some oversight, difficult to understand, the facts upon which the defense of equitable estoppel was based found no place in the findings of the court, and no exceptions were preserved covering the omission. Nevertheless the cause was twice argued here as if the question were before us of whether the judgment is right in view of the facts so omitted from the findings. Counsel for appellant presented its side of the litigation as if proper exceptions were preserved, and counsel for respondent joined in that treatment of the appeal. A re-argument was ordered wholly as to the effect upon the judgment of the facts not covered by the findings. This court considered such unfound facts, and upon the whole case decided that no equitable estoppel was established. In that situation I shall do as all others seem to have done,—treat the case as if proper exceptions were taken and preserved in the record, presenting the question of whether an equitable estoppel was established by the facts proved, not covered by the court's findings.

I concurred in the decision rendered in *Ashland v. C. & N. W. R. Co.* 105 Wis. 398, 80 N. W. 1101, not without serious misgivings as to its correctness. Reconsideration of the subject here involved, aided by a clearer presentation of the same facts in this case, satisfies me that error was there committed by reason of a failure to fully comprehend the scope of the doctrine of equitable estoppel as applied to municipal-

ities.    I will, endeavor to analyze the former opinion and show wherein I deem it infirm.    That done, there will be little need to discuss the reasoning of the court upon this occasion, since it is not pretended that the present decision does more than affirm what was formerly decided.

Before proceeding to discuss the former opinion, however, I will state more fully than the court has done the facts of the case as I understand them to appear by the record.    In my judgment the statement made by the court does not bring into clear light the strong circumstances from which arises a conviction that it would be unjust to compel the appellant to vacate the situation that it has occupied and enjoyed for some sixteen years.    The statement of facts now made is not supposed to be in any way contradictory to that made by the court, but rather to be supplementary thereto.    The trouble with the court's statement, from my view of the case, is that it makes the vital question in the litigation, whether appellant did anything or failed to do anything under the vacation ordinance, so called, of December 1, 1887, before receiving notice that it had been repealed.    The trial court so viewed the situation in the former case, as did also, in my judgment, this court upon the appeal.    The same is obviously true of the trial of this case below.    In my judgment such circumstances do not necessarily cut any figure in determining the rights of the parties.

Much of the territory within the limits of the city of *Ashland* is platted and occupied, and has been for many years. Within the territory affected by this litigation the streets cross each other at right angles, those extending back from Chequamegon Bay and nearly at right angles with the shore thereof being called avenues.    Those crossing the same and running nearly parallel with the shore are called streets.    The thoroughfare nearest to and parallel with the bay is called Front street, while those parallel therewith are numbered consecutively, commencing with Second street.    Fourth avenue

is one of the principal thoroughfares of the city. The width
thereof is' sixty-six feet. The platted blocks abutting thereon
are 300 feet square. The cross streets are sixty-six feet wide.
That part of the avenue particularly involved here is between
Third and Sixth streets. Such avenue is one' of the streets,
originally platted and dedicated. That occurred as early as
1857, and the avenue was then named Madison avenue. In
1887 the name was changed to Fourth avenue. It extended
back from the bay in a southerly direction, through a thickly
populated and business part of the city, about one and a half
miles. ' Appellant's tracks extend across the territory between
Third and Sixth streets, crossing Fourth avenue. That part.
of such avenue between Front and Third streets, prior to
1890, was prepared for public travel, and has since been used
for that purpose. That part lying south of Sixth street was.
also, prior to 1890, so prepared, and has ever since been so
used. Up to 1892 that part of the avenue between Third and
Sixth streets had not been so improved, but the surface there-
of was level and had been customarily used for travel. In
1892 the plaintiff built a sidewalk upon the west side of the
avenue from Fourth street to Sixth street, which remained
in place till February 9, 1897, when it was removed by de-
fendant's predecessor. It has not since been restored. In
1885, defendant's predecessor constructed a railroad track
through the corporate limits of plaintiff. About 1887 such
track was connected with those of three other railroad compa-
nies within such limits, for the mutual convenience of all, to
wit, the Northern Pacific Railroad Company, defendant's.
predecessor, the Chicago, St. Paul, Minneapolis & Omaha
Railway Company, the Milwaukee, Lake Shore & Western
Railway Company, and the Wisconsin Central Railway Com-
pany.

In 1887 those companies proposed to plaintiff to contribute
$5,000 for the improvement of Vaughn avenue, a street run-
ning parallel with Fourth avenue and located two blocks and

the width of one street westerly therefrom, on condition that
the city should vacate portions of certain streets and alleys,
including that part of Fourth avenue between Third and
Sixth streets involved in this litigation. The offer was ac-
cepted by resolution of the city council. That resolution pro-
vided for the improvement of Vaughn avenue and the doing
of much other work contemplated by the proposition of the
railway companies. The resolution further provided that
upon the contemplated improvements being made measures
should be taken to vacate streets and alleys as suggested by
the railway companies. December 1, 1887, pursuant to the
agreement between the railway companies and the city thus
made, the latter passed and caused to be published, intending
to exhaust its jurisdiction in the premises, an ordinance in
form vacating those parts of streets and alleys agreed to be
vacated, including that part of Fourth avenue now involved.
The railway companies, within a reasonable time thereafter,
complied with the agreement on their part as to paying the
expense of improving Vaughn avenue. In 1888 plaintiff,
treating that part of Fourth avenue which it had attempted
to vacate as no longer a public thoroughfare, constructed a
city building immediately south of Third street, entirely ob-
structing the avenue from such street north to the railway
track. Appellant's predecessor, regarding the streets which
the city had attempted to vacate as abandoned for public pur-
poses, expended a large sum of money in the arrangement of
its tracks and buildings for the purpose of conducting its busi-
ness in the city, the outlay extending over a period of more
than ten years. It will be irreparably damaged if the status
of things thus created be now changed. The attitude of the
city and people thereof prior to and at the time of, and for
years subsequent to, the vacation proceedings, was such as to
indicate a general desire that the railway companies should
locate their yards, depot grounds and station facilities as they
were located. The necessary result of such location, as could

easily have been seen from the outset, was the obstruction of Fourth, Third and Second avenues between Third and Sixth streets, and the disuse thereof, within such territory, as public streets. Appellant's predecessor paid into the city treasury, as its proportion of the cost of improving Vaughn avenue as aforesaid, $2,307.32. The city has never repaid or offered to repay that money. The other railway companies paid their due proportion of the cost of the improvement as before indicated. Such improvement made necessary the incurrence of considerable expense in constructing a bridge for appellant's track over Vaughn avenue. All the companies laid out their yards and constructed their depots and station facilities with reference to the streets and alleys, obstructed as aforesaid, having been abandoned as ways for public travel. The attitude of the city, indicated by its placing its own buildings in the street, was continued in various ways. In 1890 it built an addition to the fire hall in Fourth avenue. In 1892 it constructed therein a storage shed west of the hall. The buildings at this time occupied nearly the whole width of the avenue. In 1892 it built a hay shed at the rear of the fire hall in the center of the avenue. In 1894 it moved a building into the avenue, where it has since remained and been used as a street commissioner's office.

The vacation ordinance of 1887 was, June 26, 1888, in form repealed, but no personal notice thereof was ever given to the defendant's predecessor, nor was such predecessor distinctly notified that the city would insist upon restoring Fourth avenue to the public use where it was supposed to have been vacated or abandoned, till May, 1901. That notification was not followed up by any disturbance of appellant. On the contrary, in 1895, the city and the citizens of *Ashland* requested the railway companies, in view of the streets having been vacated or the companies having been permitted to use the same as part of their depot grounds in the manner before stated, to remove their pile bridges over

Vaughn avenue and replace them with steel structures. Defendant complied at an expense of $3,500. Since 1887 the railway companies have remained in undisturbed possession of the streets covered by the vacation proceedings, and during all that time have proceeded openly with the work of arranging tracks and other station facilities, expending in doing so the following sums: Defendant, about $30,000; the Chicago & Northwestern Railway Company, $50,000; the Wisconsin Central Railway Company, some $75,000. Part of such expense was incurred in the construction of an expensive stone depot, which entirely obstructs Third avenue. In the meantime Second avenue has been obstructed by a freight house, by the warehouse of the Armour Packing Company, and other structures. If it should now be held that defendant has no right to use Fourth avenue in any way inconsistent with the use thereof as a public street, it would be obliged to rearrange its entire station facilities, and suffer irreparable loss.

The foregoing shows that as early as 1887 appellant's predecessor and its associate railway companies, which included all the railway interests in one of the most important cities, as regards commerce, in the state, involving to a great extent investments of millions of dollars, and the people and governing authorities of such city evinced a desire that the station facilities of all of such railway companies should be located together within the corporate limits of such city, substantially as they were located, making necessary the interruption of the use of the streets now complained of. At the early date mentioned there was an occupancy of the streets in such a way as to plainly indicate that it was intended to be permanent, and to indicate to any fair-minded man that the conduct of the railway companies in that regard was grounded upon a supposed general consent thereto by all interested parties, public and private. From that time on till the commencement of this action, covering a period of some

thirteen years, there was not a moment that the city and every citizen thereof specially interested did not have a cause of action against appellant's predecessor and also against its associate railway companies on account of the encroachment on the streets mentioned. Yet no move was made to seriously challenge their right to continue such occupancy. Not only was no such move made during that long period, but throughout the whole time there were affirmative acts by the city, and assent, by not objecting, to acts of private parties in treating the streets in question as abandoned as regards the public use thereof, such conduct on the whole being inconsistent with any other reasonable theory than that the city recognized the right of the railway companies to maintain their station facilities as arranged. During that period the improvements by the railway companies, to enable them to properly perform their quasi-public duties, exceeded $100,000; and the value of property within the city so increased that to change the location of the yards and make new arrangements to properly exercise the railway franchises, would entail not only loss of most of the money expended in the old location, but a very large sum in addition.

How radically the decision in the former case in the trial court and that upon appeal, and the decision in this case in the trial court and this as well, failed to apply to the entire situation thus pictured the broad doctrine of equity, that in dealing with the subject of whether the public should be held to have lost a right by reason of its having been superseded by an overpowering equity the chancellor does not look merely to lapse of time or any particular circumstance by itself, but to all the circumstances bearing on the question, the full scope of the inquiry being this: In view of the whole situation what does right and justice require? (*Paine L. Co. v. Oshkosh,* 89 Wis. 449, 61 N. W. 1108), can best be made plain by showing by the findings in the two cases what the trial judges conceived were all the vital facts for equitable

cognizance. Here is a synopsis of the findings in the first case, so far as they affect the subject of equitable estoppel: First, in 1887 the railway corporations and the city of *Ashland* agreed that the latter would vacate specific parts of streets and alleys, including that part of Fourth avenue in controversy, and in consideration thereof the former would pay the expenses of certain improvements of Vaughn avenue. Second, in December, 1887, the city in form by ordinance performed its part of said agreement. Third, in 1888 the city repealed the vacation ordinance. Fourth, the defendant's predecessor, relying upon the vacation proceedings, expended large sums of money in the construction of its yards and in paying for the improvement of Vaughn avenue. Conclusion: The city of *Ashland* is estopped from claiming that the said portion of Vaughn avenue in controversy is a public street.

Thus it will be seen that the whole case was made to depend on whether the railway companies, relying upon the validity of the vacation proceedings, were induced to occupy a position from which they could not recede without irreparable loss. The general attitude of the city and the public for a period of more than ten years, indicating that the occupancy of the street by the railway companies was acquiesced in and regarded as permanent, and the expenditure by the railway companies of large sums of money, the expenditure extending over the whole period mentioned, without any attempt being made by the city or any private person interested to challenge the occupancy of the streets, were not taken notice of at all. As the case was decided, if the railway companies did not acquire an overpowering equity solely by reason of having acted on the faith of the vacation proceedings, they did not possess any such equity. It seems that argument is unnecessary to demonstrate that such a view excluded the most powerful factors in the case in building up an equitable right in favor of the railway companies. When the case

came here the judicial vision was not in the least broadened, as will clearly appear from what follows.

Speaking of the basis for the equitable estoppel claimed, as this court understood the matter, it was said:

"The alleged estoppel is based upon the finding that the city and the railroad companies entered into an agreement by which the city agreed to vacate the street, and the companies to pay for certain specified improvements in other streets." *Ashland v. C. & N. W. R. Co.* 105 Wis. 403, 80 N. W. 1103.

The court then said, in effect, that no estoppel could legitimately rest on such an agreement for the following reasons: First. The railway companies knew that the city did not possess power to make the agreement. Second. The railway companies knew or were bound to know that the vacation proceedings were *ultra vires* and void. Third. The railway companies knew or were bound to know that the vacation ordinance was repealed on June 26, 1888. Fourth. There is no evidence that the railway companies took any action under the vacation ordinance prior to the repeal. Fifth. Whatever was done by the railway companies was done in reliance upon the void contract to vacate, which does not constitute a colorable basis for an equitable estoppel. General conclusion, based on the decided propositions: It appears neither that the city abandoned its right to the street, nor was guilty of any delay, nor did any act upon which the defendant railway company or its predecessor had a right to rely. That is, as I understand it, that the city was not guilty of any such delay, nor did any such act, because the defendant was bound to know that the agreement of the city to vacate the streets, and the vacation proceedings, were void. In that not only did the court overlook the real basis in the evidence for an equitable estoppel, but wrongly assumed, it seems, that merely because the vacation proceedings were void they could not form the basis for an equitable estoppel.

There is ample authority for the position that an *ultra*

*vires* act, strictly so called, of a municipality, forms no legiti-
mate basis for an equitable estoppel because of the presump-
tion of law that every one knows the limitations upon corpo-
rate power.    That does not apply to acts within corporate
power, void because of some illegal manner of execution.
Such acts are commonly spoken of as *ultra vires,* but they are
not so within the restricted meaning of that term applicable
to the rule to which the court referred.    That meaning is,
"beyond the capacity of the corporation to do at all." 27 Am.
& Eng. Ency. of Law, 352, 353.    When the corporation has
power to act—it was conceded by the court the city of *Ash-
land* had power to vacate streets—but fails to exercise that
power in a legal way, equities in favor of private parties may
be based thereon.    The difference between the two situations
will be found on examination to be the key to the difference
in results in cases where an equitable estoppel against a mu-
nicipal corporation was asserted.    In *Snyder v. Mt. Pulaski,*
176 Ill. 397, 52 N. E. 62, it was said that no equitable es-
toppel can arise from an act of municipal authorities with-
out authority of law.    In *Seeger v. Mueller,* 133 Ill. 86–95,
24 N. E. 513, the court said:

"No estoppel can ordinarily arise from the act of a mu-
nicipal corporation or officer done in violation of or without
authority of law.    Every person is presumed to know the
nature and extent of the powers of municipal officers, and
therefore cannot be deemed to have been deceived or misled
by acts done without legal authority."

It must be easily seen that the principle of those cases
should not have been applied here, first, because the at-
tempted vacation of the street was not an act beyond the scope
of corporate power; and second, because the equitable es-
toppel was not dependent upon the vacation ordinance as a
basis, but upon the general conduct of the city and all the cir-
cumstances whereby the railway companies finally came to
the position from which they could not retire without irrep-

arable loss.   The equitable right of the railway companies might be sustained and the vacation ordinance and its repeal left entirely out of view.   Here is the broad principle governing the matter, as stated by the Illinois court and approved by this court in *Paine L. Co. v. Oshkosh,* 89 Wis. 449, 61 N. W. 1108:

"Where the public have long withheld the assertion of control over streets, and private parties have been, by the acts of those representing the public, induced to believe the streets abandoned by the public, and on the faith of that belief, and with the acquiescence of those representing the public, they have placed themselves, by making structures or improvements in the street, in a situation where they must suffer pecuniary loss if those representing the public be allowed afterwards to allege that the street was not abandoned, the doctrine of equitable estoppel may be applied." *Lee v. Mound Station,* 118 Ill. 304, 317, 8 N. E. 759.

It seems to me that the determination of the former case as if the equities of the railway company depended solely on whether they had any standing in a court of equity since their conduct was based on a void contract, is so clearly wrong that it should not stand in the way of a reconsideration of the whole subject upon this appeal.

The trial court in this case, guided by the decision upon the former appeal, very naturally overlooked everything bearing on the question of equitable estoppel except, first, whether the vacation proceedings were *ultra vires,* and second, whether any act was done by appellant on the faith of such vacation proceedings before the repealing ordinance.   This court having said that the vacating ordinance was *ultra vires* and so could not be referred to as a basis for an equitable estoppel, the trial court of course felt bound to follow it.   That of itself was fatal to appellant's position.   There was but one other phase, as has been seen, which, within the limits of the former decision, could in any event cut any figure.   That was whether appellant did anything or failed to do anything

in good faith relying upon the validity of the vacation ordinance before the repeal thereof. That the court very properly felt bound by the former decision to decide in favor of respondent.

My brethren, in endeavoring to meet one of my criticisms of the former decision, say:

"We did not declare that the attempted vacating of streets by a void ordinance might not be considered in association with other facts and circumstances, and the whole be held cogent enough to bring into operation an estoppel against the city. That we had no such intention is rendered plain by the very context of the opinion, pointing out that there was no clear and sufficient proof that the railway company had erected any structures or incurred any considerable expense in reliance upon that attempted vacation, they being chargeable with knowledge of its repeal."

I am unable to understand the former opinion that way, but whether the court's view be right or not it is manifest by the reasoning of my brethren that they understand that the court on the former occasion went no further than to assume, without deciding, that acts might have been done by the railway companies in good faith relying upon the validity of the vacation proceedings, which would have given the companies a standing in a court of equity, but that they did no such acts. My own view is that the effect of the former opinion is this: The vacation ordinance was void; therefore no equitable estoppel could be predicated thereon. However, if the void ordinance could form the basis for an equitable estoppel upon proof being made that the railway company changed its position in reliance thereon, there was no such proof in the record. Neither formerly, nor on the present occasion did the court give due weight to all the circumstances characterizing the occupancy of the street by the railway companies, its undisturbed character through a period of more than ten years, the positive acts of encouragement on the part of the city to continue occupancy by conducting the public affairs as if the

streets occupied by the companies were no longer public thoroughfares, the final creation of a situation, the growth of which could have been easily stopped at the outset before any considerable outlay had been made by the railway companies, which cannot be retired from without enormous loss.

I need not say more to make my position appear clear. If I were to view this case from the narrow standpoint of whether the appellant in good faith changed its position relying upon the validity of the vacating ordinance, either before or after the repeal thereof, my conclusion would be in harmony with that of my brethren. But looking at all the circumstances bearing upon appellant's right, it seems that one of the strongest cases is presented upon the record before us for the application of the doctrine of equitable estoppel that can be found in the books. As held in *Paine L. Co. v. Oshkosh*, the principal inquiry in all this class of cases is, In view of all the circumstances does justice require an equitable estoppel to be raised against the public?

CASSODAY, C. J. I concur in the opinion of my brother MARSHALL.